UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------- X
                       :

FIRSTLAND INTERNATIONAL, INC. AND    :       02-CV-4043 (ARR)
SHAO ZENG CHAI,                    :
                Plaintiffs,      :       NOT FOR
                       :       ELECTRONIC OR
    -against-                :       PRINT PUBLICATION
                       :

UNITED STATES IMMIGRATION AND        :
NATURALIZATION SERVICE,           :       OPINION AND ORDER
                Defendant.    :
                       :

------------------------------------------------------------------- X

ROSS, United States District Judge:

By motion dated June 21, 2005, plaintiffs Firstland International, Inc. ("Firstland") and

Shao Zeng Chai ("Chai") seek an award of attorney's fees and expenses under the Equal Access

to Justice Act (EAJA), 28 U.S.C. § 2412(d), in the amount of $325,199.34. Defendant U.S.

Immigration and Naturalization Service (INS)[1] challenges plaintiffs' application on the grounds

that the INS's position throughout this action – during both administrative proceedings and

federal court litigation – was substantially justified.[2] I find that the INS's position throughout

this case was substantially justified, and therefore deny plaintiffs' application for fees and

expenses.

---

[1] The INS ceased to exist on March 1, 2003, when its functions were transferred to the Department of Homeland Security. Both plaintiff and defendant continue to refer to the defendant as INS for purposes of this litigation; the court will do the same.

[2] The INS argues in the alternative that (1) it would be unjust to award plaintiff any fees or expenses because the Court of Appeals resolved this case with little assistance from the plaintiffs' attorneys, and (2) any award granted under EAJA should be greatly reduced from the amount sought, because plaintiffs' request is excessive. Because I find that the government's position throughout the action was substantially justified and therefore decline to award fees or expenses, it is not necessary to consider these additional arguments.

1

## BACKGROUND

Plaintiff Firstland International, Inc., a manufacturer of cigar accessories, is a wholly-owned subsidiary of the Shanghai Yangzhang Shiguang Lighter Co., Ltd., an 80-employee company headquartered in China. In 1997, Firstland successfully applied for a L-1A nonimmigrant visa on behalf of plaintiff Shao Zeng Chai, a high-ranking manager in the parent company. R. 30.[3] This L-1A visa allowed Chai to come to the United States as a nonimmigrant intracompany managerial or executive transferee pursuant to 8 U.S.C. § 1101(a)(15)(L).[4] A nonimmigrant visa allows an alien to enter the Unites States for a predetermined "period of authorized admission" only; it is not intended to be a precursor to permanent resident status. See 8 U.S.C. §§ 1184(a) and 1184(c)(2)(D). Chai's wife and daughter joined him in the United States. Chai's original L-1A visa allowed him to stay in the United States until April 9, 1998. R. 30. Prior to its expiration, Firstland, on behalf of Chai, applied for and received an extension of the L1-A visa, which allowed Chai to remain in the United States as Firstland's president until April 9, 2000. R. 33, 41.

In August of 1999, Firstland filed an I-140 petition on behalf of Chai, asking the INS to designate Chai as a "multinational executive or manager" and adjust his status to "immigrant"

---

[3]"R." refers to the administrative record filed with the court by defendant INS.

[4]The Immigration and Nationality Act (INA) defines a "nonimmigrant intracompany managerial or executive transferee" as an alien

who, within 3 years preceding the time of his application for admission into the United States, has been employed continuously for one year by a firm or corporation or other legal identity or an affiliate or subsidiary thereof and who seeks to enter the United States temporarily in order to continue to render his services to the same employer or a subsidiary or affiliate thereof in a capacity that is managerial, executive, or involves specialized knowledge.

8 U.S.C. § 1101(a)(15)(L).

pursuant to § 203(b)(1)(C) of the Immigration and Nationality Act (INA), 8 U.S.C. §

1153(b)(1)(C).[5] R. 44. This adjustment of status would allow the Chai family to apply to

become permanent residents of the United States. The INS granted the I-140 petition in March

of 2000. R. 48.[6] On the basis of this approval, Chai and his family filed an I-485 petition, asking

the INS to adjust their status to that of lawful permanent residents.


Administrative Proceedings

On October 27, 2000, the INS sent Firstland a notice of intent to revoke Chai's I-140

petition. R. 132-33. This notice explained that "[i]t has now come to the attention of this

Service" that Chai's position did not qualify for approval under I-140 requirements, because the

evidence on record "do[es] not show that the beneficiary's position with the United States entity

---

[5]Section 203(b) of the Immigration and Nationality Act, codified at 8 U.S.C.
§1153(b)(1)(C), states in pertinent part:
> (1) Priority workers. Visas shall first be made available... to qualified immigrants who are
> aliens described in any of the following subparagraphs (A) through (C):
>
> . . .
>
> (C) Certain multinational executives and managers. An alien is described in this
> subparagraph if the alien, in the 3 years preceding the time of the alien's application for
> classification and admission into the United States under this subparagraph, has been
> employed for at least 1 year by a firm or corporation or other legal entity or an affiliate or
> subsidiary thereof and the alien seeks to enter the United States in order to continue to
> render services to the same employer or to a subsidiary or affiliate thereof in a capacity
> that is managerial or executive.

[6]While the I-140 petition application was pending, Firstland applied for an additional
extension of the L1-A non-immigrant visa for Chai. R. 47. However, when the INS asked
Firstland, in May 2000, to provide additional information on Chai's position to support the L1-A
visa extension (R. 55-58), Firstland and Chai decided to abandon the L1-A extension application.
R. 28. Instead, Chai applied for a C09 employment authorization card. Id. On August 3, 2000,
Chai's application for C09 employment authorization was approved for the period from July 24,
2000 to July 23, 2001. R. 59.

is executive or managerial in nature other than in position title." R. 130. The INS explained that

several factors contributed to its concern that Chai's position did not qualify for I-140 approval.

First, the INS noted that, based upon the company's reported gross receipts, "it appears

questionable that... the services of an individual primarily engaged in executive or managerial

activities would be required." Id. Additionally, the fact that Firstland had only three employees

(including Chai) suggested that the company did not have "sufficient staff to relieve the

beneficiary from primarily performing the mundane duties of your organization." Id. Finally,

Firstland's statements regarding Chai's duties "do[] not demonstrate that the preponderance of

the beneficiary's duties are primarily managerial or executive in nature." Id. The notice of intent

to revoke informed Firstland that the company had thirty days to submit evidence to overcome

the reasons for revocation, and provided Firstland with a detailed list of requested

documentation. R. 132-33.

In response to the notice of revocation, Firstland submitted additional materials to the

INS on November 23, 2000. R. 134. These materials included brief descriptions of the duties

performed by Chai, the vice president, and the part-time sales/office assistant, and financial

documents including payroll documentation and tax returns indicating that its sales had increased

significantly in 1999 and 2000. R. 134-245.

After reviewing Firstland's submission, the INS concluded that the evidence on record

did not establish that Chai had been and would be employed in a primarily managerial or

executive capacity. R. 130. In his January 22, 2001 decision, the Director of the INS Vermont

Service Center informed plaintiffs that Chai's L1-A visa extension and the I-140 petition had

been "approved in error." Id. The Director explained that Firstland "ha[d] not shown that the

beneficiary will function at a senior level within the organization hierarchy other than in position title." Id. Despite the fact that Chai's title was "president," the INS concluded that the description of Chai's position duties submitted by Firstland did not demonstrate that Chai's position was executive or managerial. Id. Additionally, the INS found that Firstland had not adequately explained who within the company performed "the mundane duties required to support and execute the international trade activities described in the petition," given that the only non-"executive" employee was a part-time clerk who worked only 20 hours per week. Id. As a result, the INS concluded that Chai "has been and will be engaged primarily in the non-managerial, day to day operations involved in producing a product or service." Id. Because the Director concluded that the previous approvals had been erroneous, the INS revoked its prior approval of the I-140 petition. R. 131.

On February 8, 2001, Firstland and Chai appealed the revocation decision to the INS Administrative Appeals Unit (AAU). R. 13. They argued, among other things, that INS policy prevented the readjudication of a previously-approved petition absent gross error or fraud. Specifically, plaintiffs alleged that the INS had a "principle[] of res judicata enunciated by its own Central Office that facts which have already been decided in earlier adjudications affecting the same parties should not be re-decided absent fraud or gross error." R. 18. Plaintiffs claim that this policy was first stated in a January 13, 1989 telex from James Puleo, INS Assistant Commissioner for Adjudications, to INS field offices (hereinafter "Puleo Telex") and repeatedly "affirmed" by INS managers. R. 18-19. Additionally, plaintiffs argued that the decision to revoke approval of the I-140 petition had been inappropriately based on Firstland's small size. Id.

5

On June 21, 2002, the Associate Commissioner of the Office of Administrative Appeals

(OAA) issued an opinion upholding the decision of the Director of the Vermont Service Center.

R. 2-3. The Associate Commissioner noted that the Service Center Director had concluded that

both the I-140 petition in question and the L-1A extension petition had been approved in error.

R. 8. After reviewing the statutory definitions of "managerial" and "executive capacity"

employment under the INA,[7] and the position descriptions for Chai, the vice-president, and the

sales/office assistant provided by Firstland in the initial petition and in response to the notice of

---

[7]Managerial and executive capacity employment assignments are defined in sections 101(a)(44)(A) and (B) of the INA, codified at 8 U.S.C. §§ 1101(a)(44(A) and (B):

(A) The term **"managerial capacity"** means an assignment within an organization in which the employee primarily--
- (i) manages the organization, or a department, subdivision, function, or component of the organization;
- (ii) supervises and controls the work of other supervisory, professional, or managerial employees, or manages an essential function within the organization, or a department or subdivision of the organization;
- (iii) if another employee or other employees are directly supervised, has the authority to hire and fire or recommend those as well as other personnel actions (such as promotion and leave authorization) or, if no other employee is directly supervised, functions at a senior level within the organizational hierarchy or with respect to the function managed; and
- (iv) exercises discretion over the day-to-day operations of the activity or function for which the employee has authority.

A first-line supervisor is not considered to be acting in a managerial capacity merely by virtue of the supervisor's supervisory duties unless the employees supervised are professional.

(B) The term **"executive capacity"** means an assignment within an organization in which the employee primarily--
- (i) directs the management of the organization or a major component or function of the organization;
- (ii) establishes the goals and policies of the organization, component, or function;
- (iii) exercises wide latitude in discretionary decision-making; and
- (iv) receives only general supervision or direction from higher level executives, the board of directors, or stockholders of the organization.

intent to revoke petition approval, the Associate Commissioner considered petitioners' arguments. R. 3-8. With respect to the argument that the INS had violated its own policy by reconsidering whether Chai was employed in a managerial or executive capacity absent evidence of "gross error or fraud" in the previous approval, the Associate Commissioner stated that INS policy did not require the agency to approve applications or petitions based on managerial or executive status simply because previous applications had been approved: "It would be absurd to suggest that the Service or any agency must treat acknowledged errors as binding precedent." R. 8. The Associate Commissioner noted that the Service Center Director had, in fact, determined that the prior assessment of Chai's position as managerial or executive had been erroneous. Id. After a thorough examination of the position descriptions provided by Firstland, the Associate Commissioner concluded that the revocation was appropriate because Firstland had failed to establish that Chai's primary duties were managerial or executive in nature. R. 9. The Associate Commissioner similarly found that petitioners' other objections to the revocation decision were without merit. R. 10-11.

At some point following the Associate Commissioner's decision upholding the visa revocation, the OAA, at petitioners' request, reopened the proceedings to allow the petitioners to submit evidence that allegedly was not previously considered by the Director or the Associate Commissioner. See In Re Firstland International, Inc., INS-AAO Recons. Decision, 11/18/02 (hereinafter "INS-AAO Recons."), submitted as Ex.6 to Stahl Declaration, 2. After noting that many of the "new" documents submitted by petitioners were previously part of the record, the Associate Commissioner again reviewed the evidence on record as to Chai's position and duties. Id. at 2, 4-9. The Associate Commissioner concluded that Chai "spends the majority of his time

7

on the petitioner's marketing and sales functions" and therefore was not "considered to be employed in a managerial or executive capacity." Id. at 8. In this reopened proceeding, the Associate Commissioner again responded directly to petitioners' claim that the INS had violated INS policy by re-evaluating Chai's position. Citing supporting INS and federal court decisions, the Associate Commissioner stated that the INS was not required to approve applications merely because they had been erroneously approved in prior proceedings. Id. at 10 (citing Matter of Church Scientology Int'l, 19 I. & N. Dec. 593 (BIA 1988); Sussex Eng. Ltd. v. Montgomery, 825 F.2d 1084, 1090 (6th Cir. 1987), cert. denied 485 U.S. 1008 (1988)). The Associate Commissioner determined that the Service Center Director had acknowledged that gross error had resulted in the initial approval of an L-1A petition on Chai's behalf. Id. Specifically, the Associate Commissioner explained that the initial description of Chai's position submitted to the INS on March 14, 1997 had provided only a generalized description of the proposed position and included duties that "would not be considered to be at the executive or managerial level, such as conducting research and signing contracts." Id. at 10-11. Due to the "absence of a comprehensive description of the beneficiary's duties," the Associate Commissioner concluded that "approval of the L-1A petition in the beneficiary's behalf could be considered gross error on the part of the Service." Id. at 11. Therefore, the Associate Commissioner affirmed the previous decision of the Associate Commissioner upholding the Director's revocation of approval on appeal. Id. at 12.

District Court Proceedings

Following the OAA's dismissal of their appeal, Firstland and Chai filed this lawsuit on July 17, 2002, claiming that defendant INS wrongly revoked its approval of the I-140 visa petition filed by Firstland on behalf of Chai. The INS moved to dismiss the complaint for lack of subject matter jurisdiction pursuant to Rule 12(h)(3) of the Federal Rules of Civil Procedure, arguing that the court was without jurisdiction to hear plaintiffs' claim because the INS, acting pursuant to powers delegated to it by the Attorney General, had exercised its discretion in revoking Chai's visa. Specifically, defendant INS contended that Section 242(a)(2)(B)(ii) of the INA, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), 8 U.S.C. § 1252(a)(2)(B)(ii), stripped the court of its jurisdiction to review the revocation decision. Section 242(a)(2)(B) of the INA provides that "[n]otwithstanding any other provision of law, no court shall have jurisdiction to review... (ii) any other decision or action of the Attorney General the authority for which is specified under this subchapter to be in the discretion of the Attorney General..." 8 U.S.C. § 1252(a)(2)(B).

In their briefs before this court, both parties agreed that decisions regarding visa revocation were committed to the discretion of the Attorney General under Section 205 of the INA, 8 U.S.C. § 1155, which provides:

> The Attorney General may, at any time, for what he deems to be good and sufficient cause, revoke the approval of any petition approved by him under section 1154 of this title. Such revocation shall be effective as of the date of approval of any such petition. In no case, however, shall such revocation have effect unless there is mailed to the petitioner's last known address a notice of the revocation and unless notice of the revocation is communicated through the Secretary of State to the beneficiary of the petition before the beneficiary commences his journey to the United States . . . .

8 U.S.C. § 1155. However, the plaintiffs, citing legislative history and various canons of statutory interpretation, argued that the jurisdiction-stripping provision contained in Section 242 applies only to discretionary decisions taken with regard to orders of <u>removal</u>, not to decisions regarding visa revocation under 8 U.S.C. § 1155.

This court ultimately agreed with defendant INS that the plain meaning of the text of 8 U.S.C. § 1252(a)(2)(B) should govern. Because 8 U.S.C. § 1155 falls within the same subchapter, entitled "Immigration," as the jurisdiction-stripping provision in 8 U.S.C. § 1252, I concluded that this court had no jurisdiction to hear plaintiffs' complaint and granted defendant's motion to dismiss. <u>Firstland International, Inc. v. INS</u>, No. 02-CV-4043 (E.D.N.Y. May 16, 2003).

## Court of Appeals Proceedings

Plaintiffs appealed my decision to the Court of Appeals for the Second Circuit. The arguments initially presented by the parties centered on the issue that had been before the district court: whether Section 242(a)(2)(B)(ii) of the INA, 8 U.S.C. § 1252(a)(2)(B)(ii), stripped the federal courts of jurisdiction over visa revocation decisions.

During oral argument, however, Circuit Judge Robert A. Katzmann postulated that the third sentence of 8 U.S.C. § 1155, which states that "[i]n no case, however, shall such revocation have effect... unless notice of the revocation is communicated through the Secretary of State to the beneficiary of the petition before the beneficiary commences his journey to the United States," might deprive the INS of the authority to revoke approved visa petitions for beneficiaries already present in the United States. <u>See</u> Def.'s Mem. of Law in Opp'n to Pl.'s Application for

10

Fees and Expenses under EAJA (hereinafter "Def.'s EAJA Opp'n Mem."), 5. According to the INS, this argument had not previously been raised by either party to the litigation; the Court of Appeals considered it <u>sua sponte</u>. <u>See</u> <u>id.</u>, 5-6. Following oral argument, the Court of Appeals requested that the parties submit additional briefs specifically addressing whether the Attorney General had the discretion under 8 U.S.C. § 1155 to revoke a visa petition from a beneficiary who was already in the United States.

On August 2, 2004, the Court of Appeals vacated the district court judgment. <u>See</u> <u>Firstland International, Inc. v. INS</u>, 377 F.3d 127 (2d Cir. 2004). Specifically, the Court of Appeals held that the third sentence of 8 U.S.C. § 1155, which precludes the INS from revoking an approved visa petition once the beneficiary has "commence[d] his journey to the United States," applies to beneficiaries who are already within the United States at the time of their applications as well as those who are outside the United States. <u>Id.</u> at 132.[8] Because Chai was already in the United States when he received notice that his visa petition had been revoked, the Court of Appeals concluded that 8 U.S.C. § 1155 did not authorize the INS to revoke Chai's visa petition. <u>Id.</u> Since there was no statutory authority for the INS to revoke Chai's visa, revocation was not a decision or action "specified... to be within the discretion of the Attorney General" as required by the jurisdiction-stripping provision of 8 U.S.C. § 1252(a)(2)(B)(ii), and was therefore subject to review by the federal courts. <u>Id.</u> The Court of Appeals remanded the case for disposition consistent with its decision. <u>Id.</u> at 133.

---

[8]Following this decision by the Second Circuit Court of Appeals, Congress amended 8 U.S.C. § 1155. Section 5304(c) of the Intelligence Reform and Terrorism Prevention Act of 2004, 150 Cong. Rec. H10930-06, which was passed on December 7, 2004, deleted the third and fourth sentences of 8 U.S.C. § 1155. Section 5304(d) of the same act made these amendments applicable to revocations made before, on, or after December 7, 2004.

On remand, I ordered that the case be remanded to the United States Citizen and Immigration Service for (1) reinstatement of the I-140 immigrant petition filed by Firstland on behalf of Chai with its original priority date and (2) readjudication of the Chai family's I-485 applications for adjustment of status.

## DISCUSSION

Plaintiffs seek an award of costs and attorneys' fees pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d). EAJA provides, in pertinent part, that "a court shall award to a prevailing party other than the United States fees and other expenses... incurred by that party in any civil action... including proceedings for judicial review of agency action, brought by or against the United States... <u>unless the court finds that the position of the United States was substantially justified</u> or that special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A) (emphasis added). Because I find that the position of the United States was substantially justified, I deny plaintiffs' request for an award of attorney's fees and expenses.

### EAJA "Substantial Justification" Standard

An EAJA application must be denied if the position of the United States was substantially justified. <u>See</u> 28 U.S.C. § 2412(d)(1). For the purposes of EAJA applications, the "position of the United States" refers to both "the position taken by the United States in the civil action" and "the action or failure to act by the agency upon which the civil action is based." 28 U.S.C. § 2412(d)(2)(D). However, although the government's actions in both the agency and the courts must be considered in evaluating whether the government's position was substantially justified,

12

the Supreme Court has stated that "only one threshold determination for the entire civil action is to be made." Comm'r v. Jean, 496 U.S. 154, 159 (1990); see also Al-Harbi v. INS, 284 F.3d 1080, 1084 (9th Cir. 2005) (noting that EAJA "favors treating a case as an inclusive whole rather than as atomized line items" with regard to whether the government's position was substantially justified).

The government's position in a given matter may be deemed "substantially justified" if "a reasonable person could think it correct, that is, if it has a reasonable basis in law and fact." Pierce v. Underwood, 487 U.S. 552, 566 n.2 (1988); Sotelo-Aquije v. Slattery, 62 F.3d 54, 57 (2d Cir. 1995). The Supreme Court has explained that the phrase "substantially justified" does not mean "'justified to a high degree,' but rather 'justified in substance or in the main' -- that is, justified to a degree that could satisfy a reasonable person." Pierce, 487 U.S. at 565. A court's evaluation of whether the government's position in a given matter was substantially justified is entirely distinct from its prior decision on the merits of the case. See, e.g., Johnson v. Gonzales, 416 F.3d 205, 210 (3d Cir. 2005) (noting that, for EAJA purposes, a court "must not assume that the government's position was not substantially justified simply because it lost on the merits"); Dantran v. Dep't of Labor, 246 F.3d 36, 40 (1st Cir. 2001) (noting that the fact that "the government lost in the underlying litigation does not create a presumption that its position was not substantially justified"). Therefore, a court may conclude that the government's position was substantially justified, even if it has ruled against the government on the merits or found that the government's action was not entirely correct. See, e.g., Kirkland v. Railroad Retirement Board, 706 F.2d 99, 105 (2d Cir. 1983) (denying application for attorney's fees because "the Board ha[d] sustained its burden of showing that its position, although erroneous, was not so devoid of

13

legal or factual support that a fee award [was] appropriate"); Vacchio v. Ashcroft, 404 F.3d 663, 677 (2d Cir. 2005) (finding INS position substantially justified despite "[the court's] doubts over the INS's actions" and the fact that the INS relied on a "viable, but far from compelling legal theory").

The government bears the burden of showing that its position was substantially justified. See, e.g., Vacchio, 404 F.3d at 674; Fed. Election Comm'n v. Political Contributions Data, Inc., 995 F.2d 383, 386 (2d Cir. 1993); Sotelo-Aquije, 62 F.3d at 57. In this case, the INS maintains that its position throughout this matter – both within the agency and during litigation – was eminently reasonable and therefore substantially justified. Plaintiffs, however, claim that the government's position was not substantially justified, because "[the INS] should have resolved this case in Plaintiffs' favor long ago on the basis of INS's own accepted policy." Pl.'s Mem. of Law in Support of EAJA Fees (hereinafter "Pl.'s EAJA Mem."), 5. Plaintiffs contend that the INS's position was unreasonable because the agency violated an INS policy, allegedly set forth in the Puleo Telex, that "issues involving the same parties that had been previously decided should not be examined again absent gross error," and then attempted to prevent judicial review of its incorrect decision by "cast[ing] about for another argument (jurisdiction), which [it] could more reasonably present." Pl.'s Br. in Supp. of Application for Fees and Expenses under EAJA (hereinafter "Pl.'s EAJA Br."), 27-28.


INS's Position at the Administrative Level

The relevant government position at the agency level consisted of (1) the INS's decision to revoke approval of the I-140 visa petition applied for by Firstland on behalf of Chai, and (2) its

14

subsequent actions in upholding this decision both on appeal and after the proceedings were reopened to consider allegedly new evidence. The parties disagree vehemently about the criteria this court should apply in assessing whether the INS acted reasonably at the agency level. The INS contends that its actions were justified – if not required by law – so long as it had "good and sufficient cause" to revoke Firstland's I-140 immigrant petition on behalf of Chai. Plaintiffs, on the other hand, insist that the INS cannot reasonably or justifiably revoke a petition from a beneficiary whose position was previously classified as managerial or executive unless the INS alleges that the previous approval involved "gross error." For the sake of clarity, I will discuss each proposed standard in term.

**"Good and Sufficient Cause" Standard**

The statute governing revocation of visa petitions permits the INS to revoke the approval of any petition "at any time, for what [it] deems to be good and sufficient cause." 8 U.S.C. § 1155. The regulations governing revocation of immigrant petitions[9] require the INS to notify petitioners and consider their objections, but do not impose additional substantive requirements on the INS. See 8 C.F.R. §§ 205.1, 205.2. Section 205.2, for example, provides that any

---

[9]Different regulations govern the revocation of immigrant and non-immigrant petitions. Compare 8 C.F.R. §§ 205.1, 205.2 (revocation of immigrant petitions) with 8 C.F.R. § 214.2(l)(9)(iii) (revocation of non-immigrant petitions for intracompany transferees).

Firstland's I-140 petition on behalf of Chai was filed under 8 C.F.R. §204.5(j)(1), which governs immigrant petitions by companies on behalf of multinational executives or managers under Section 203(b)(1)(C) of the INA, 8 U.S.C. § 203(b)(1)(C). The INS initially granted this petition in March 2000. R. 246. The INS then issued a notice of intent to revoke in October 2000, and, after reviewing the materials submitted by Firstland in response to the notice, revoked this immigrant petition in January 2001. R. 131. The applicable regulation is therefore 8 C.F.R. §§ 205.2, which governs revocation of immigrant petitions on notice.

15

authorized INS officer may, upon notice to the petitioner, revoke a petition "when the necessity for the revocation comes to the attention of this Service." Therefore, the INS suggests that this court, in determining whether the INS's actions at the agency level were "substantially justified," should consider whether it had "good and sufficient cause" to revoke Firstland's I-140 petition on behalf of Chai. Def.'s EAJA Opp'n Mem., 12, 15.

The INS claims that it has so clearly satisfied this requirement that "[p]laintiffs do not dispute that INS had 'good and sufficient cause' to revoke the visa..." Id. at 15. The court notes, however, that while plaintiffs discuss only the alleged "gross error" policy (discussed below) in their EAJA pleadings, they did allege (albeit in a cursory fashion) that the INS failed to show "good and substantial cause" for revoking the petition in both their appeal and their motion for reconsideration. R. 13, 23.

The INS and the few courts that have considered the issue agree that the INS has "good and sufficient cause" to issue a notice of intent to revoke a visa petition where "the evidence of record at the time the notice was issued, if unexplained and unrebutted, would have warranted a denial based upon the petitioner's failure to meet his or her burden of proof" in demonstrating his eligibility. Matter of Estime, 19 I. & N. Dec. 450, 451 (BIA 1987). See also Matter of Li, 20 I. & N. Dec. 700, 701 (BIA 1993); Matter of Tawfik, 20 I. & N. Dec. 166, 167 (BIA 1990); Ramilo v. DOJ, 13 F. Supp. 2d 1055, 1057 (D. Haw. 1998), aff'd 178 F.3d 1300 (9th Cir. 1999); Ana Int'l v. Way, 393 F.3d 886, 894 (9th Cir. 2004); Systronics Corp. v. INS, 153 F. Supp. 2d 7, 12 (D.D.C. 2001). Based upon my review of both the evidence on record with the INS at the time the notice of intent to revoke was issued and the additional documentation provided by Firstland through the administrative review process, I conclude that the INS could reasonably

16

have determined that the position descriptions submitted by Firstland do not clearly demonstrate that Chai's duties were primarily managerial or executive at the time the immigrant petition was filed in August 1999. To qualify for managerial or executive capacity employment, the petitioner must show that (1) the beneficiary performs the managerial or executive responsibilities enumerated at 8 U.S.C. §§ 1101(a)(44)(A), (B) (supra, fn 7) and (2) the beneficiary primarily performs these specified responsibilities, rather than spending a majority of his or her time on day-to-day functions. Champion World v. INS, 940 F.2d 1533 (Table), No. 90-35644, 1991 U.S. App. LEXIS 17884, 2-3 (9th Cir., July 30, 1991). The INS has established that an employee who primarily performs the tasks necessary to produce a product or to provide services is not employed in a managerial or executive capacity. See, e.g., Matter of Church Scientology Int'l, 19 I. & N. Dec. 593, 604 (BIA 1988). This court agrees with the INS determination that many of Chai's duties, as enumerated by Firstland, appear to be day-to-day tasks necessary to produce a product or provide services rather than managerial or executive responsibilities. For example, the time Chai spends meeting with clients and potential suppliers, attending industry conferences and promotional events, reviewing and executing contracts, deciding on company expenditures and investments, and analyzing promotional strategies is most appropriately described as sales and marketing efforts, rather than executive or managerial duties. R. 134-35. The fact that Firstland had only two full-time employees and one part-time clerk supports the INS's concern that Chai would necessarily be involved in the day-to-day routine activities required to operate a company. This concern is further strengthened by Firstland's vice president's statement, in a November 2000 letter intended to support Chai's qualification as an executive/manager, that additional employees were needed to "relieve Mr. Chai and [the vice-president] from some

17

nonmanagement duties that are necessary to perform while launching and nurturing a company."
R. 134.

Additionally, the INS has consistently held that "the realization by the district director that he erred in approving [a] petition, however arrived at, may be good and sufficient cause for revoking his approval, provided the district director's revised opinion is supported by the record." Matter of Ho, 19 I. & N. Dec. 582, 590 (BIA 1988); see also In re: Juan Garcia Garcia, 2004 WL 2374707 (BIA Aug. 5, 2004); In re: Petitioner, 2003 WL 2008064 (INS OAA Jan. 30, 2003); Singh v. Aguirre, No. C-04-1282, 2005 WL 946852 at *3 (N.D.Ca. Apr. 25, 2005). In the instant case, the Vermont Service Center Director explicitly stated in his January 22, 2000 revocation decision that he "concluded that this E13 petition and the beneficiary's L1 new office extension petition were approved in error." R. 130 (emphasis added). The detailed rationale for the revocation provided by the Director, as well as the thorough analysis of the evidentiary record conducted by the Office of Administrative Appeals on appeal and on reconsideration, indicate that the Director's determination that he had erred in approving the earlier petitions was well supported by the information on record. See R. 130-31; R. 2-11; INS-AAO Recons., Ex.6 to Stahl Declaration, 8-11.

Therefore, I conclude that the INS had good and sufficient cause to revoke Firstland's petition on behalf of Chai, and acted reasonably in upholding the revocation both on appeal and on reconsideration.

**"Gross Error" Standard**

Plaintiffs claim that a standard stricter than the statutory "good and sufficient cause" requirement governs INS decisions to deny or revoke petitions where, as in this case, the agency had previously granted a petition for the same beneficiary on the basis of his employment in a managerial or executive capacity. Specifically, plaintiffs allege that INS policy precludes the agency from reconsidering whether a previously-approved beneficiary is employed in a managerial or executive capacity unless the agency has determined that the prior adjudication involved "gross error." Pl.'s EAJA Mem., 3, 5; Pl.'s EAJA Br., 1, 6, 8. Plaintiffs assert that this policy was created in a January 13, 1989 telex from James Puleo, INS Assistant Commissioner for Adjudications, to INS field offices (hereinafter "Puleo Telex"), which stated in relevant part:

> An increasing number of cases are being litigated where the Service has granted L Classification and extensions of stay to alien beneficiaries and later, denied Schedule A, Group IV labor certification[10]... Adjudicators are determining, after the alien has been in the United States for up to five years under the L Classification, that the alien does not qualify as a manager or executive. The courts do not look favorably on the Service's change in position, unless the facts of the case have changed to warrant such a reversal.

> When the prior approval of L Classification and extensions involve gross error, the adjudicator cannot compound the error by approving [later applications].

---

[10]"Schedule A, Group IV labor classification" refers to a former provision of the Department of Labor regulations, 20 C.F.R. § 656.10(d) (1990), which gave blanket labor certification to immigrant managers and executives transferring or transferred to the same organization in the United States, but did not assure a visa preference. See C. Gordon, S. Mailman, & S. Yale-Loehr, Immigration Law and Procedure, § 39.03[4](f).

The Group IV classification was eliminated in 1991, based upon a determination that it had been effectively subsumed by the statutory provisions of the Immigration Act of 1990, Pub. L. No. 101-649, § 101, 104 Stat. 4978, which placed executive or managerial transferees in the first employment-based preference group, "priority workers," who do not need labor certification. See id., §§ 39.01, 39.03[4], citing 56 Fed. Reg. 54,820, 54,823, 54,827 (Oct. 23, 1991). See also 8 U.S.C. § 1153(b)(1)(C).

In all cases where Schedule A, Group IV is being denied, the adjudicator should first review the nonimmigrant petition file to determine the original basis for L Classification. A denial of Schedule A, Group IV should reflect some change in the circumstances of the employment which would cause the alien's job to no longer be in a managerial or executive capacity. If the facts are the same, but the approval of L Classification and subsequent extensions involved gross error, the notice of denial should explain how the original classification was in error.

...

This will put the Service in a better position in court to defend against allegations of arbitrary and capricious decision making.

Puleo Telex, submitted as Ex. 8 to Stahl Declaration; quoted in Ex. 1 to Pl.'s EAJA Mem.

Plaintiffs further allege that this policy statement has been repeatedly "affirmed" by high-ranking

INS officials. See, e.g., R. 18-19; Pl.'s EAJA Mem., 3; Pl.'s EAJA Br., 6-12.[11]

---

[11]After reviewing the documents and materials submitted by the plaintiffs as evidence of the INS's "affirmation" of the alleged "gross error" policy, I conclude plaintiffs have presented only one example of the INS itself confirming the existence of a "gross error" policy. See Transcript of "INS Adjudications," 2002 Spring American Immigration Lawyers Association Conference, Washington, D.C., March 8, 2002, submitted as Ex. 7 to Pl.'s EAJA Br. (quoting INS Executive Deputy Commissioner William Yates' 2002 statement, in response to AILA's questions about readjudication standards, that "[w]hen we talk about that readjudication... the standard that we've had, that an application or petition should not be readjudicated unless there is evidence of gross error, is our standard.").

The other "affirmations" presented by plaintiffs are merely meeting notes or bulletins written members of the American Immigration Lawyers Association (AILA). These documents demonstrate only that the AILA was suggesting or encouraging the INS to adopt a policy requiring findings of "gross error" prior to readjudications. See "Unofficial Minutes of the American Immigration Lawyers Association (AILA)-INS HQ Adjudications Committee Meeting," Sept. 21, 1999, submitted as Ex. 2 to Pl.'s EAJA Br. (reporting that the INS "agreed" to AILA's suggestion that a "gross error standard" be applied to all readjudications; the court notes that the document states that "[t]hese minutes were not reviewed or approved by INS"); "NSC Liaison Notes" written by the AILA Liaison to the Nebraska Service Center, Nov. 8, 1999, submitted as Ex. 3 to Pl's EAJA Br. (reflecting that the AILA representative told the INS Service Center that such issues should not be readjudicated); "NSC Liaison Minutes," Dec. 29, 1999, submitted as Ex. 4 to Pl.'s EAJA Br. (same); Vermont Service Center Liaison Meeting Notes, Aug. 13, 2001, submitted as Ex. 5 to Pl.'s EAJA Br. (describing the proposed resolution to a specific case rather than a general policy).

Based on this policy, plaintiffs claim that it was unreasonable for the INS to revoke

Chai's I-140 petition because the INS had previously determined – when evaluating Firstland's

original L-1A nonimmigrant petition on behalf of Chai in 1987 and the L-1A extension in 1988 –

that Chai's position as president of Firstland satisfied the requirements for a managerial or

executive capacity job assignment. Plaintiffs assert that this revocation violated the policy

outlined in the Puleo Telex because the INS reversed a prior approval when the facts were the

same or, in fact, more favorable to Firstland and Chai, since the company had expanded and

Chai's salary had increased since his entry into the United States, and "[a]t no time during

administrative proceedings did the INS ever allege gross error or fraud in any of Plaintiffs'

applications." Pl's EAJA Mem., 5-6.

The INS strongly disputes plaintiffs' contention that INS policy requires a finding of

gross error before it can deny or revoke visa petitions. First, the INS contends that the Puleo

Telex was "solely an internal guideline for INS visa petition adjudications," rather than a binding

policy as suggested by plaintiffs. Def.'s EAJA Opp'n Mem., 12-13. The INS emphasizes that

neither the governing statute, 8 U.S.C. § 1155, nor the guiding regulations, 8 C.F.R. §§ 205.1 and

205.2, require that the INS find gross error before revoking a previously-approved immigrant

petition.[12] Id. at 13. Additionally, the INS contends that it cannot be required to repeat earlier

---

[12]The court notes that the regulation governing revocation of <u>nonimmigrant</u> petitions for aliens classified as managerial and executive intracompany transfers does list "gross error" as one of several bases for revocation on notice:

(iii) Revocation on notice.
(A) The director shall send to the petitioner a notice of intent to revoke the petition in relevant part if he/she finds that:
    (1) One or more entities are no longer qualifying organizations;
    (2) The alien is no longer eligible under section 101(a)(15)(L) of the Act;

mistakes, both because it is obligated to "protect the integrity of the immigration laws" and because it simply has no authority to confer a benefit (i.e., immigrant status) on a petitioner it knows is not eligible for that benefit. Id. at 13-14; see also In re: Petitioner (File EAC-97-169-51840), 1998 WL 34060416 (AAU, Dec. 8, 1998) ("The Service has no authority to confer a benefit under the Act as a form of relief to a petitioner that has not established eligibility for that benefit.").[13]

---

      (3) A qualifying organization(s) violated requirements of section 101(a)(15)(L) and these regulations;
      (4) The statement of facts contained in the petition was not true and correct; or
      (5) Approval of the petition involved gross error; or
      (6) None of the qualifying organizations in a blanket petition have used the blanket petition procedure for three consecutive years.

    (B) The notice of intent to revoke shall contain a detailed statement of the grounds for the revocation and the time period allowed for the petitioner's rebuttal...

8 C.F.R. § 214.2(l)(9)(iii) (emphasis added). However, as noted in footnote 9, the visa petition at issue in this case was an immigrant petition rather than a nonimmigrant petition, and therefore subject to different regulations.

    [13]The INS also argues that, even if the Puleo Telex is considered a statement of policy, it does not apply to the Firstland/Chai situation. Def.'s EAJA Opp'n Mem., 14. The Puleo Telex specifically describes the denial of an immigrant visa petition ("Schedule A, Group IV labor certification") following the erroneous approval of a previous nonimmigrant petition ("L certification") on behalf of the same party. Puleo Telex, submitted as Ex. 8 to Stahl Declaration. The instant case is different, the INS argues, because Firstland's petition on behalf of Chai for immigrant status was initially approved, but then revoked (rather than being denied outright). Def.'s EAJA Opp'n Mem., 14 n5. I finds it unnecessary to evaluate this argument, because I conclude that, assuming the INS has a "gross error" policy, the agency satisfactorily satisfied its requirements in the instant case.
    However, I agree that, at least on its face, the Puleo Telex speaks only to one certification ("Schedule A, Group IV labor certification"). Puleo Telex, submitted as Ex. 8 to Stahl Declaration. This certification no longer exists. See footnote 10, supra. Therefore, the Telex arguably became obsolete when "Schedule A, Group IV petitions" were eliminated in 1991. See id. (citing Immigration Law and Procedure, §§ 39.01, 39.03[4]).

22

Alternatively, the INS claims that, if this court were to find that INS policy required that it find that the prior approval of nonimmigrant and/or immigrant petitions constituted "gross error" before it could deny or revoke a later immigrant petition on behalf of the same beneficiary, it has satisfied that requirement in this case. Id. at 14. The INS notes that both the initial revocation decision and the decision upholding the revocation on appeal clearly stated that Firstland's previous petitions on behalf of Chai had been "approved in error," and explained that the prior petitions should not have been granted because Chai's position did not satisfy the agency's requirements for an executive or managerial capacity job assignment. See R. 132-33; R. 130-31; R. 8-9. Additionally, after plaintiffs' case was reopened for reconsideration, the Associate Commissioner of the Office of Administrative Appeals specifically noted that the Service Center Director "acknowledged that gross error resulted in the approval of an L-1A petition in the beneficiary's behalf." INS-AAO Recons., Ex. 6 of Stahl Declaration, at 10 (emphasis added). The Associate Commissioner went on to explain that "a review of the petitioner's original description of the proffered position reveals why the director made such a determination... In the absence of a comprehensive description of the beneficiary's duties, the approval of the L-1A petition in the beneficiary's behalf could be considered gross error on the part of the Service." Id. at 10-11 (emphasis added).

After reviewing the Puleo Telex, the "affirmations" cited by plaintiffs, and numerous decisions by the INS Board of Immigration Appeals and Office of Administrative Appeals, I conclude that the plaintiffs' allegations regarding the "gross error" policy do not suggest that the INS's actions at the administrative level were unreasonable or unjustified.

23

First, I find little if any support for plaintiffs' contention that the Puleo Telex limits the

INS's ability to reconsider whether a position qualifies as a managerial or executive capacity

assignment. Neither the Puleo Telex nor any of the alleged affirmations state that the INS is

bound by previous erroneous decisions; in fact, the Puleo Telex clearly states that "[w]hen the

prior approval of L Classification and extensions involve gross error, the adjudicator cannot

compound the error by approving [later applications]." Puleo Telex, Ex. 8 to Stahl Declaration.

The INS and the federal courts have consistently held that the INS can – and, in fact, must –

correct known errors. See, e.g., Sussex Engineering, Ltd. v. Montgomery, 825 F.2d 1084, 1090

(6th Cir. 1987), cert. denied E & S Design & Dev., Ltd. v. Montgomery, 485 U.S. 1008 (1988)

("It is absurd to suggest that the INS or any agency must treat acknowledged errors as binding

precedent."); Matter of Church Scientology Int'l, 19 I. & N. Dec. 593 (BIA 1988) ("[T]his

Service is not required to approve applications or petitions where eligibility has not been

demonstrated, merely because of prior approvals which may have been erroneous.").

Rather than limiting review, the Puleo Telex simply instructs adjudicators who are

denying extensions of or revoking managerial and executive classifications to explain the basis

for their decisions by describing (1) the change in employment circumstances that disqualifies the

beneficiary or (2) the error in the prior approval(s) that is being corrected ("[i]f the facts are the

same, but the approval of L Classification and subsequent extensions involved gross error, the

notice of denial should explain how the original classification was in error."). Puleo Telex, Ex. 8

to Stahl Declaration. In fact, the court notes that the Puleo Telex, read as a whole, suggests that

Mr. Puleo's intention in issuing the Telex was not to limit denials or revocations in marginal

cases, but rather to encourage INS adjudicators to include these explanations so that the federal

courts would be less likely to overturn INS denials and revocations as arbitrary and capricious:

> An increasing number of cases are being litigated where the Service has granted L
> Classification and extensions of stay to alien beneficiaries and later, denied
> Schedule A, Group IV labor certification... The courts do not look favorably on
> the Service's change in position, unless the facts of the case have changed to
> warrant such a reversal... [These explanations] will put the Service in a better
> position in court to defend against allegations of arbitrary and capricious decision
> making.

Id.[14]

This court's conclusion that the Puleo Telex merely instructs adjudicators to explain the

reasons for inconsistent determinations, rather than limiting readjudications, is consistent with

the decisions of the District Court for the District of Puerto Rico in Omni Packaging v. INS. See

733 F. Supp. 500 (D.P.R. 1990); 930 F. Supp. 28 (D.P.R. 1996), and 940 F. Supp. 42 (D.P.R.

1996). In a case occurring soon after the Puleo Telex was issued, the INS denied Class A, Group

IV certification to a beneficiary who had previously been granted an L-1 nonimmigrant visa and

several L-1 visa extensions. Omni Packaging, 733 F. Supp. at 501. Although the INS told the

beneficiary that he did not qualify for Class A, Group IV certification, it did not explain why the

beneficiary was being denied this certification after having previously qualified for L-1

classifications under the same criteria. Id. The District Court for the District of Puerto Rico,

---

[14]Unlike the Puleo Telex, the 2002 Yates statement cited by plaintiffs suggests that the
INS agreed to avoid reviewing certain decisions, rather than merely stating that adjudicators
should explain the basis for denials: "an application or petition should not be readjudicated
unless there is evidence of gross error." Transcript of "INS Adjudications," 2002 Spring
American Immigration Lawyers Association Conference, Washington, D.C., March 8, 2002,
submitted as Ex. 7 to Pl.'s EAJA Br. However, even assuming arguendo that this Yates
statement established a clear "gross error" policy by which the INS was bound, it would have no
bearing on the instant case, which was adjudicated by the INS between 1999 and 2001.

citing the Puleo Telex, held that the denial of Class A, Group IV certification was an abuse of discretion because the INS had failed to "specifically elucidate why the previous granting and extensions of Mr. Avila's L-1 visa were erroneous," and remanded the case to the INS with instructions to reconsider and fully explain the basis for the conflicting determinations. Id. at 504. On remand, the INS affirmed its denial of Class A, Group IV certification, but "explained the inconsistency in its grant of the L-1 visa and denial of the blanket labor certification for purposes of the third preference visa" by stating that "the L-1 visa and extensions thereto were granted erroneously... given that none of the supporting documentation accompanying the L-1 petition warranted a finding that Mr. Avila de la Rosa was a manager or executive." Omni Packaging, 930 F. Supp. at 31. Thereafter, the district court, rejecting plaintiffs' arguments regarding estoppel, upheld the INS denial. Id. at 34-36. Finally, in an EAJA action, the district court denied plaintiffs' request for attorneys' fees because the government's position had been substantially justified. Omni Packaging, 940 F. Supp. at 46. The court noted that the abuse of discretion that motivated the remand "was not the INS's decision to deny the third preference classification, but rather its failure to explain the change in its position with respect to whether Avila's duties were managerial or executive." Id. The court found that the INS's decision to deny the beneficiary the classification he sought, "though poorly executed, was [] valid and reasonable" given the INS's findings regarding the beneficiary's qualifications. Id. The court further noted that "it was reasonable for the INS to correct what it believed was an error, even if its explanation of the error was insufficient as an initial matter." Id. at 47. Thus, even where the INS failed initially to provide sufficient explanation for a denial, the INS's actions in denying the benefit sought may be considered reasonable.

26

Second, assuming _arguendo_ that the INS did have an internal policy limiting readjudication of the managerial or executive nature of beneficiaries' positions to cases in which previous approvals involved "gross error," this court concludes that the INS sufficiently satisfied that requirement in the instant case. Neither the Puleo Telex, the materials cited by plaintiffs, nor the numerous INS and federal court opinions reviewed by this court suggest that an INS Service Center Director issuing a revocation decision would have to state that there had been "gross error" – as opposed to "error" – in a previous proceeding. In fact, in evaluating a revocation issued under 8 C.F.R. §214.2(l)(9)(iii)(A)(5), which specifically provides for the revocation of a nonimmigrant petition where "approval of the petition involved gross error," the INS Office of Administrative Appeals explicitly rejected a petitioner's contention that the term "gross error" required more than a mere discovery of error in previous proceedings: "[t]he plain meaning of this provision is clear and there is nothing to imply a two-tier standard distinguishing between gross and simple error." In re: Petitioner (File EAC 97-169-51840), 1998 WL 34060416 (OAA Dec. 8, 1998). After noting that the revocation decision had stated that the center director's "initial finding that the beneficiary [was qualified] was _in error_," the OAA explained that any decision which erroneously grants a beneficiary a benefit for which he is statutorily ineligible "unquestionably constitutes gross error" and concluded that "the argument that the center director's decision was not in compliance with the standard governing revocation is not persuasive." Id.; see also Matter of X (File 97-169-51563), 19 Immig. Rptr. B2-55 (AAU, June 24, 1998) (upholding revocation of a nonimmigrant petition under 8 C.F.R. §214(l)(9)(iii)(A)(5) "gross error" provision where the "director determined that the petitions were approved _in error_.") (emphasis added).

27

In the instant case, the INS repeatedly explained that it had erred in approving Firstland's previous petitions on behalf of Chai because the description of his position did not satisfy the agency's requirements for an executive or managerial capacity job assignment. In the January 22, 2000 revocation decision, the Vermont Service Center Director stated that the INS had "concluded that this E13 petition and the beneficiary's L1 new office extension petition were approved in error." R. 130 (emphasis added). He explained that the INS should not have approved the previous petitions because Firstland "has not shown that the beneficiary will function at a senior level within the organization hierarchy other than in position title." Id. The Center Director provided a detailed rationale for the INS's finding of error and subsequent reversal, including, for example, a discussion of the fact that the position description submitted by Firstland did not support a managerial or executive classification for Chai because the company "ha[d] not adequately explained who performs the preponderance of the mundane duties required to support and execute the international trade activities described in the petition, if not the beneficiary and your other executive." Id. On appeal, the Associate Commissioner found, in response to plaintiffs' allegations regarding the Puleo Telex policy, that the Center Director had (a) determined that the previous assessment of Chai's position as managerial or executive had been erroneous ("[t]he service center has acknowledged in this proceeding that the previous approvals were made in error") and (b) explained why he was reversing that assessment. R. 8-9. On reconsideration, the Associate Commissioner noted that

> In this proceeding, the director acknowledged that gross error resulted in the approval of an L-1A petition in the beneficiary's behalf, and a review of the petitioner's original description of the proffered position reveals why the director made such a determination... In the absence of a comprehensive description of the

28

beneficiary's duties, the approval of the L-1A petition in the beneficiary's behalf could be considered gross error on the part of the Service.

Id. at 10-11 (emphasis added).

Finally, even if INS policy did require that the agency literally state that a prior approval involved "gross error," the Assistant Commissioner's decision on reconsideration would satisfy that requirement. The INS Office of Administrative Appeals has recently stated that "[a]n application or petition that fails to comply with the technical requirements of the law may be denied by the AAO even if the Service Center does not identify all of the grounds for denial in the initial decision." In re: Petitioner (File WAC-03-079-53760), 2004 WL 3457096 (AAO, Oct. 28, 2004). Therefore, the AAO's statement on reconsideration that "gross error resulted in the approval" of the earlier petitions on behalf of Chai arguably cures any possible insufficiency in the Service Center Director's statement that the petitions were approved "in error" under the alleged gross error policy. INS-AAO Recons., Ex. 6 of Stahl Declaration, at 10.

I conclude that the INS's actions at the agency level were reasonable both in fact and in law. The Service Center Director reasonably determined that his previous decisions approving petitions based on Chai's managerial or executive position were erroneous, and therefore had good and sufficient cause to revoke the I-140 immigrant petition in question. Assuming that INS policy did in fact limit readjudication to those cases in which previous decisions involved "gross error," as alleged by plaintiffs, I find that the INS sufficiently complied with that policy by stating initially that previous approvals had been granted "in error" and on reconsideration that those approvals constituted "gross error," and by explaining the basis for its findings of error.

29

The positions taken by the INS in litigation before both the district court and the Court of Appeals are also relevant to this inquiry. Before the district court, the government argued that 8 U.S.C. § 1252(a)(2)(B)(ii) stripped the federal courts of jurisdiction to hear plaintiffs' claim because the INS, acting pursuant to powers delegated to it by the Attorney General, had exercised its discretion in revoking Chai's visa. On appeal to the Second Circuit Court of Appeals, the government initially presented the same argument. After the Court of Appeals sua sponte questioned whether the third sentence of 8 U.S.C. § 1155 deprived the INS of the authority to revoke approved visa petitions for beneficiaries already present in the United States, the government contended the third sentence of 8 U.S.C. § 1155 did not apply to aliens who were already in the United States at the time of their application.

As described above, the government argued before the district court that 8 U.S.C. § 1252(a)(2)(B)(ii) precluded judicial review of the INS's decision to revoke Chai's visa petition because decisions regarding visa revocations were solely in the discretion of the Attorney General.[15] It is worth noting that, at that point in the litigation, both parties agreed that the decision to revoke a visa was committed to the discretion of the Attorney General and delegated to the INS. The dispute, therefore, centered on whether the 8 U.S.C. § 1252(a)(2)(B)(ii), which

---

[15]Plaintiffs claim that the INS's litigation position was unjustified because the INS "did not even bother attempting to defend Defendant INS's administrative position," but rather raised a jurisdictional defense. Pl.'s EAJA Br., 28. Specifically, plaintiffs allege that, in finding litigation positions reasonable, courts "could hardly have meant that an agency which chooses not to defend its administrative position but casts about for totally unrelated grounds not available to it in administrative proceedings would be substantially justified." Id. at 29. I note that, because a finding that the court has jurisdiction is a prerequisite to review of any complaint, it was entirely appropriate for the INS to raise any questions about the court's jurisdiction at the outset of litigation.

deprives the courts of jurisdiction to review "any other decision or action of the Attorney General the authority for which is specified under this subchapter to be in the discretion of the Attorney General," applied to visa revocations as well as orders of removal. The INS argued that, because 8 U.S.C. § 1155, which provides that visa revocations are within the discretion of the Attorney General, is within the same subchapter as the § 1252(a)(2)(B)(ii), the plain language of the statute compelled the conclusion that this court was without jurisdiction to consider the INS's decision to revoke Chai's visa petition.

An important factor to be considered in evaluating whether the government's position was substantially justified is the existence or lack thereof of supporting legal precedent. See, e.g., Stolpe v. United States, 36 Fed. Cl. 259 (1996) (finding government's defense reasonable for EAJA purposes "[w]hen law is unsettled or issue is one of first impression"); Kolman v. Shalala, 39 F.3d 173, 177 (7th Cir. 1994) (finding government's position substantially justified where supported by another circuit's decision); Owen v. United States, 861 F.2d 1273, 1274 (Fed. Cir. 1988) (finding that position of government when taken was substantially justified based on then-existing precedents that were later overturned). In this case, the unsettled nature of the law regarding the reach of Section 1252 strongly supports the conclusion that the INS's position before the district court was substantially justified. In my decision of May 16, 2003, I noted that courts considering this issue had reached very different conclusions, resulting in "an inharmonious jurisprudence on the range of Section 1252's applicability." Firstland International, Inc. v. INS, No. 02-CV-4043 (E.D.N.Y. May 16, 2003); see also Pozdniakov v. INS, 354 F.3d 176, 178 (2d Cir. 2003) (noting that "courts are split as to whether § 1252(a)(2)(B)(ii) bars judicial review of discretionary denials arising in the context of removal

31

proceedings, or whether it bars judicial review of every discretionary denial, including those arising beyond a deportation context"). Additionally, there was considerable precedent supporting the INS's position. Numerous courts, including the Sixth, Seventh, and Tenth Circuits, had applied the plain language rule and concluded that Section 1252 applied to discretionary decisions beyond those involving final orders of removal. See, e.g., CDI Information Servs., Inc. v. Reno, 278 F.3d 616, 620 (6th Cir. 2002); McBrearty v. Perryman, 212 F.3d 985, 987 (7th Cir. 2000); Van Dinh v. Reno, 197 F.3d 427, 432 (10th Cir. 1999).

On appeal to the Second Circuit, the INS initially presented arguments entirely consistent with its position before the district court. After the Court of Appeals sua sponte suggested that the third sentence of 8 U.S.C. § 1155 might have barred the Attorney General from revoking Chai's visa petition because he was not notified of the revocation before he began his journey to the United States, the INS argued that 8 U.S.C. § 1155 did not apply to aliens who were in the United States at the time of application. Def.'s EAJA Opp'n Mem., 11. Although the Court of Appeals ultimately disagreed with the INS, that decision does not indicate that the government's position was not substantially justified. See, e.g., Johnson, 416 F.3d at 210; Dantran, 246 F.3d at 40. As addressed below, the novel nature of the question presented in this case and the fact that the only existing precedent supported the INS's argument lead me to conclude that the government's position was substantially justified.

The novelty of the litigated issues is a pertinent question in evaluating whether the government's position was substantially justified. See, e.g., Gutierrez v. Barnhart, 274 F.3d 1255, 1261 (9th Cir. 2001) (noting that "[w]hether a litigated issue is one of first impression is properly considered as one factor in determining whether the government's litigation position is

32

substantially justified"); Marcus v. Shalala, 17 F.3d 1033, 1037 (7th Cir. 1994) (finding that

"uncertainty in the law arising from conflicting authority or the novelty of the question weighs in

the government's favor when analyzing the reasonableness of the government's litigation

position"); De Allende v. Baker, 891 F.2d 7, 13 (1st Cir. 1989) (finding government's position

substantially justified because issue was one of first impression). In this case, the Second Circuit

Court of Appeals raised this question of statutory interpretation sua sponte during oral argument

and clearly stated in its opinion that this issue had not been previously considered by any of the

appellate courts. Firstland Int'l, Inc., 377 F.3d at 129.

Additionally, the only previous caselaw on this issue supported the INS's position. In

1967, the Board of Immigration Appeals (BIA) held that the predecessor to Section 1155 did not

preclude the INS from revoking a visa application from a beneficiary who was in the United

States. See In re Vilos, 12 I. & N. Dec. 61, 64 (BIA 1967) (explaining that if the statute were

interpreted otherwise, "it would make petitions filed on behalf of persons already in the United

States virtually irrevocable, even when the relationship or status required for the preference no

longer existed. We cannot believe[] that it was the intention of Congress to create a class of

beneficiaries so privileged."). The only Article III court to consider this issue, an Oregon district

court, found that the text of Section 1155 was "ambiguous on its face" and therefore deferred to

the BIA's interpretation in Vilos. See ANA Int'l, Inc. v. Way, 242 F. Supp. 2d 906, 916-917 (D.

Or. 2002), rev'd on other grounds, 393 F.3d 886 (9th Cir. 2004). It therefore appears that the

INS's argument was quite reasonable. Finally, the fact that Congress amended Section 1155 by

removing the third and fourth sentence soon after the Second Circuit issued its opinion further

supports the reasonableness of the INS's contention that important policy considerations weighed against an interpretation of the statute that would make visa petitions effectively irrevocable.

## CONCLUSION

For the reasons stated above, I find that the government's position both during administrative proceedings at the INS and during litigation was substantially justified. The government has shown that the INS had good and substantial cause to revoke approval of Chai's I-140 visa petition and to uphold the revocation on appeal, given that the INS determined that (1) Chai's position as president of Firstland did not meet the requirements for a managerial or executive assignment, and (2) the approval of Firstland's previous applications on behalf of Chai had been gross error on the part of the agency, because the position descriptions, staffing, and level of business submitted to the INS at the time of application did not support the conclusion that Chai would be working primarily in a managerial or executive capacity. Additionally, the government has demonstrated that the arguments made by the INS to both the district and appellate courts were reasonable because they concerned unsettled or novel legal issues and were sufficiently supported by legal precedent.

Plaintiffs' request for attorneys' fees pursuant to the Equal Access to Justice Act is therefore denied.

SO ORDERED.

Allyne R. Ross
United States District Judge

Dated: February 14, 2006
      Brooklyn, New York

34

**SERVICE LIST:**

**Plaintiff's Attorney**
Alan Lee
408 Eighth Avenue
Suite 5A
New York, NY 10001

**Defendant's Attorneys**
Dione M. Enea
United States Attorney's Office
Eastern District of New York
One Pierrepont Plaza, 14th Floor
Brooklyn, NY 11201

Kenneth A. Stahl
United States Attorney's Office
Eastern District of New York
One Pierrepont Plaza, 14th Floor
Brooklyn, NY 11201

cc:     Magistrate Judge Joan M. Azrack